## WELCH *v.* WELCH.

### Opinion delivered January 14, 1918.

1. REFORMATION OF DEEDS—FRAUD AND MISTAKE.—Equity will reform written instruments only, (1) where there is a mutual mistake, and (2) where there has been a mistake of one party accompanied by fraud or other inequitable conduct of the remaining parties.

2. DEEDS—REFORMATION—FRAUD AND MISTAKE.—A father deeded all of his lands, consisting of 480 acres, to his son, appellee. Where it appeared that the father (deceased) only intended to convey eighty acres to appellee, and that he conveyed the larger tract be-

cause of fraud practiced by appellee, equitable relief will be granted at the instance of other heirs of deceased.

3.    REFORMATION OF DEEDS—FRAUD AND MISTAKE—PROOF.—Parol evidence is admissible in an action to reform an instrument on the ground of fraud and mistake, but the evidence to warrant a reformation must be clear and convincing.

4.    DEEDS—REFORMATION—EVIDENCE—DECLARATIONS OF GRANTOR.—W. and his wife deeded certain property to their son, appellee; appellants, other children of W., brought an action after W.'s death, to reform the deed on the ground that W. had not intended to include all the land mentioned in the deed, and that appellee had practiced fraud in the procurement of the deed. *Held,* declarations of W. and his wife, made after the execution of the deed to appellee, as to what disposition he intended to make of the lands, are inadmissible in evidence.

Appeal from Greene Chancery Court; *C. D. Frierson,* Chancellor; affirmed.

*Huddleston, Fuhr & Futrell* and *Jason L. Light,* for appellants.

1.    Disinheritance of children by a parent must be traced to one or more of three causes: (1) Estrangement of parent from child; (2) some form of insanity; (3) fraud. No estrangement nor insanity is shown. But fraud and overreaching are shown by many strong circumstances and declarations of parties. The declarations of the grantors were competent evidence. 123 Ark. 134; 99 Mass. 88; 61 N. E. 426; 2 *Id.* 925.

2.    The burden of proof was on the donee in the deed. 24 Atl. 645. A voluntary gift is conclusively fraudulent as to creditors, and this should be the rule where a gift to one child disinherits the brothers and sisters. 188 S. W. 321; 52 N. Y. Supp. 471; 62 Atl. 736; 33 S. E. 517; 83 Am. Dec. 593; 127 Am. St. 1107; 57 Barb. 458; 81 N. E. 1135.

The grantors were clearly imposed on. The declarations of both grantors and grantee and all the circumstances show a clear case of fraud and imposition and the decree should be reversed.

*Block & Kirsch,* for appellees.

1. No presumption of fraud or undue influence arises here. 17 Am. & Eng. Ann. Cas. 989; A. & E. Ann. Cas. 1915 D, 711; 81 N. E. 403; 91 S. W. 475; 24 Oh. Ct. Ct. 397; 117 S. W. 1177; 72 N. E. 1121; 47 So. 117; 106 N. W. 675; 53 S. E. 779. Confidential relations alone are not sufficient. 90 Atl. 936; 114 Pac. 33; 167 S. W. 1036; 135 Pac. 333; 62 So. 505. See also 2 Pom. Eq. Jur. (3 ed.), § 962.

2. No fraud nor undue influence was proven. The declarations of a vendor made after the conveyance, in the absence of the vendee, are not admissible to impeach the title. 40 Ark. 237; 43 *Id.* 320; 14 *Id.* 305; 79 *Id.* 418; 90 *Id.* 149; 48 *Id.* 169. In 123 Ark. 134 the declarations were made anterior to the deed. The burden was on the plaintiffs. Fraud is not proven and the chancellor so found. The decree should be affirmed.

### STATEMENT OF FACTS.

Appellants instituted suit against appellees in the Greene Chancery Court to set aside a deed executed by W. M. Welch and Margaret Welch, his wife, on the 24th day of May, A. D. 1914, to C. W. Welch, describing the following lands in Greene County, Arkansas, towit: Southeast quarter of the northwest quarter and the northeast quarter of the southwest quarter of section 13, township 17 north, range 3 east; the northeast quarter, the west half of the southeast quarter, the east half of the southwest quarter and the east half of the northwest quarter, all in section 18, township 17 north, range 4 east, alleging in substance that C. W. Welch procured the deed to all of said lands, except the eighty-acre tract known as the home place, through fraud and deceit. John Welch, one of the plaintiffs, made an additional allegation that he was the owner by gift from his father, W. M. Welch, of the southeast quarter of the northwest quarter, the northeast quarter of the southwest quarter, section 13, township 17 north, range 3 east.

William Gray and Ruth Faulkner refused to join the petitioners in the prosecution of the suit and filed no an-

swer to the bill. A separate response was filed by J. D. Block as guardian *ad litem* for Dixie Welch, Coleman Welch and Holland Welch, grandchildren of W. M. Welch, deceased, denying all the material allegations of the bill, claiming to be owners in fee of said real estate under the deed sought to be canceled. Mrs. Willie Welch, wife of C. W. Welch, grantee in said deed, filed separate response adopting the answer of the guardian *ad litem* for her children, and claiming a dower interest in all of said real estate.

Joe A. Thompson was administrator of the estate of Charley Welch, deceased, and he answered, denying all material allegations in the original bill with reference to his intestate procuring moneys from the estate of Margaret Welch, deceased. It is unnecessary to set out the allegations with reference to the personal estate of Margaret Welch, deceased, contained in the original bill, appellants having dismissed that part of their bill.

The appellants are children and grandchildren of W. M. Welch, deceased.

The court heard the case upon the pleadings and written proofs and sustained the deed as to all the lands except the southeast quarter of the northwest quarter and the northeast quarter of the southwest quarter, section 13, township 17 north, range 3 east. As to the land just described, the court canceled the deed and divested the title out of both plaintiffs and defendants and vested same in John Welch.

The court incorporated in the decree a finding and holding to the effect that the burden of proof rested upon appellants, and overruled appellants' contention that the burden rested upon the appellees to sustain the deed.

The substance of the evidence is about as follows: On May 24, 1904, W. M. Welch, the grantor in the deed, called at the office of J. D. Block, an attorney, and had him draw the deed from himself and wife, Margaret, to C. W. Welch, his son, handing him a tax receipt from which to get the description of the land. Block dictated the deed and when W. M. Welch returned after a short

absence he read the deed to him. The land was described by calls and the deed recited 480 acres, more or less. A life estate was reserved in himself and wife. The lands above described constituted all the lands owned by W. M. Welch. W. M. Welch took the deed downstairs, and, after same was executed and acknowledged, he returned to the office, handed Mr. Block $10 for his services and handed the deed to his son, C. W. Welch, who had appeared for the first time, telling him to go and record same. The deed was not recorded until the 28th day of April, 1905, about one year after its execution. C. W. Welch was the youngest son and had resided with his father from infancy, and for a number of years prior to the execution of the deed, and thereafter until his death, managed his father's business. C. W. Welch was the only member of the family who could read and write. His father depended on him in all transactions requiring writings. He paid the taxes for his father and attended to all business matters for him. He counseled with both his father and mother concerning the business. His mother usually kept the money and on his suggestion would pay the obligations incident to the business in which they were engaged. W. M. Welch placed John Welch, his son, in possession of the southwest quarter of the northwest quarter, the northeast quarter of the southwest quarter of section 13, township 17 north, range 3 east, on the 24th day of December, 1894, under promise that he would deed said tract of eighty acres to him. John Welch has continuously lived upon said tract and made valuable improvements thereon. This tract of land was included in the deed sought to be canceled. Prior to the execution of the deed, W. M. Welch deeded tracts of about equal value to some of his other children. He and his wife stated many times, both before and after the execution of the deed, that they intended to divide their lands equally between their children. The grandchildren were always included in the statements. All of their children lived near by and seemed to stand equally in the affection of both father and mother. The only preference ever ex-

pressed with reference to a division of the property was to the effect that C. W. Welch was to have the home eighty or home place. No member of the family knew of the execution of the deed until after the death of C. W. Welch. His wife, Mrs. Willie Welch, found it in his trunk after his death. She maintained silence with reference to the discovery until after the death of W. M. Welch. C. W. Welch went to Oklahoma for a time and W. M. Welch either went there with him or to him and remained there until his son's death. After the death of his son, C. W. Welch, he returned to his Arkansas home and remained there until his death on the 17th day of February, 1915. On two occasions there was some disturbance in the family. C. W. Welch got into trouble and there was a little complaint about the amount expended in his defense. In a statement to Alex Witcher, C. W. Welch stated that his mother "had no right to get mad and treat him like she was, that there was a time coming when there would be something to kick for, and also made the remark that John and some of them were sulking around him, mad at him, and said they have got no right to say anything, it don't cost them anything. * * * He (C. W. Welch) made it appear that probably she (Margaret Welch) would think that she was going to deed him eighty acres and perhaps it would be a whole lot more or all of it, or something of that kind." On the other occasion, some trouble had been brewing with reference to the Bug Gray estate. C. W. Welch stated to J. H. Cade, in the presence of Lawrence Smith in the year 1906, that "the heirs were sore at him the way the suit was settled and they would be sorer than that when the Doc Welch (referring to W. M. Welch) estate was settled, that the old folks thought that he only had a deed to eighty acres but that he had a cinch on it all; that he was paying the taxes and the whole estate belonged to him; that he had it fixed. * * *"

Before leaving for Oklahoma, C. W. Welch suggested selling the land, and referred to it as Pa's land. In 1906, Lawrence Smith heard a conversation between C. W. Welch and his father, W. M. Welch, in which C. W. Welch

said, ''Pa, make me a will to everything you have got and you won't have to look after it,'' and the old man said, ''I godlins, I have got other children besides you,'' and the old lady sort of shed a few tears and said ''she could not think of leaving Bug Gray's children out; that they had other children for the stuff to go to, part of it, their part.''  On another occasion, when Tom Rogers was helping C. W. Welch put up a telephone post on the home place contrary to the father's will, Rogers was teasing Charley, and suggested that he would die laughing if the old man would come up with an ax and cut the telephone post down.  C. W. Welch said: ''He dared him to, and looked across to the walnut tree and said, this one is on mine, it is not on his.  I dare him to touch it; as to the others, I can't say, but this one he knows better; I dare him to touch it.''

The record also contains statements made at various times after the execution and delivery of the deed from W. M. Welch to C. W. Welch, by both W. M. Welch and his wife, to the effect that they intended for Charley to have the home tract of eighty acres, and that they intended to divide their lands equally between their children.  It was also shown that a short time prior to his death, W. M. Welch prepared, on several occasions, to go to town and divide his property among his children.  It is not shown, however, that these statements were made or acts done in the hearing or presence of C. W. Welch.

HART, J., (after stating the facts).  (1-2)  The plaintiffs are children and heirs at law of W. M. Welch, deceased.  They admit in their complaint that their father intended to convey by deed to C. W. Welch, his home place of eighty acres.  In the prayer to their complaint they ask that the deed from W. M. Welch to C. W. Welch be canceled, except as to the eighty acres described and known as the home place, and that the title to same be vested in them except the interest of C. W. Welch in the lands under the law of descents and distributions in this State.  The evidence shows that W. M. Welch took a tax receipt

describing all his lands, 480 acres, to J. D. Block, an attorney, and asked him to prepare a deed to his son, C. W. Welch, to said lands, and that the attorney did so, and delivered the deed to W. M. Welch. About that time C. W. Welch came into Block's office. W. M. Welch then handed the deed to his son, C. W. Welch, and said: "Take it and go and record it." The theory of the plaintiffs is that the father only intended to convey to his son the home place comprising eighty acres. That he could not read nor write, and relied absolutely upon his son in preparing the description to the land. That W. M. Welch was laboring under the mistake that the tax receipt only contained a description of the home tract of eighty acres and did not know that it contained a description of all his lands, comprising 480 acres. That C. W. Welch, knowing these to be the facts, concealed the truth from his father in order to secure a conveyance of his father's lands, which he well knew his father never intended to convey to him. This would be a case of a mistake of one party accompanied by fraud or inequitable conduct of the other party, which is a good ground for reformation of a written instrument. It is not alone in cases of mistake that a court of equity will reform a written instrument. Under the head of Reformation and Re-execution of Instruments, Professor Pomeroy says: "This subject has already been treated under the head of 'Mistake' and little more need here be said. Equity has jurisdiction to reform written instruments in but two well defined cases: (1) Where there is a mutual mistake—that is, where there has been a meeting of minds—an agreement actually entered into, but the contract, deed, settlement, or other instrument, in its written form, does not express what was really intended by the parties thereto; and (2) where there has been a mistake of one party accompanied by fraud or other inequitable conduct of the remaining parties. In such cases the instrument may be made to conform to the agreement or transaction entered into according to the intention of

the parties.  The conditions of fact giving rise to the exercise of the jurisdiction to grant reformation are numerous.  Almost all written instruments may be reformed when a proper occasion is furnished.''  Pomeroy's Equity Jurisprudence (3 ed.), vol. 4, par. 1376; and see, also, vol. 2, par. 870; 34 Cyc., pp. 920 and 921.

The following cases recognize the rule and grant or deny the relief according to the facts of each particular case:  *Pyne* v. *Knight* (Iowa), 106 N. W. 505; *Williams* v. *Hamilton* (Iowa), 73 N. W. 1029; *Crookston Imp. Co.* v. *Marshall* (Minn.), 59 N. W. 294; *Dean* v. *Hall* (Ky.), 105 S. W. 98; *Gregory* v. *Copeland* (Ky.), 107 S. W. 768; *Taylor* v. *Deverell* (Kan.), 23 Pac. 628; *Koons* v. *Blanton* (Ind.), 27 N. E. 334; *Bergen* v. *Ebey*, 88 Ill. 269; *Kilmer* v. *Smith* (N. Y.), 33 Am. Rep. 613; *Sykes* v. *Life Ins. Co.* (N. C.), 61 S. E. 610; *Dannelly* v. *Cuthbert Oil Co.* (Ga.), 63 S. E. 257; *Venable* v. *Burton* (Ga.), 59 S. E. 253; *Sloss-Sheffield Steel & Iron Co.* v. *Aetna Life Ins. Co.* (N. J.), 70 Atl. 380; *Chelsea Nat. Bank* v. *Smith* (N. J. Chy.), 69 Atl. 533; *Metcalf* v. *Putnam* (Mass.) 9 Allen 97; *Burchard* v. *Frazier*, 23 Mich. 224.

It is true some of the cases cited are cases of reformation for mutual mistake only, but others are cases where reformation was granted where there was a mistake on the part of one party, coupled with fraud on the part of the other.  All of the cases cited recognize the rule announced by Professor Pomeroy as well established.  See, also, *Martin* v. *Hempstead County Levee Dist. No. 1*, 98 Ark. 23.  In *Cox* v. *Beard* (Kan.), 89 Pac. 671, it was said that the case came fairly within the well established rule that a deed is reformable, where, by the mistake of one party and the fraud of another, there is omitted from it land which it was stipulated should be conveyed, and numerous decisions are cited in support of the proposition.

In *Crookston Imp. Co.* v. *Marshall* (Minn.), 59 N. W. 294, there was conveyed more land than was intended, and the court held under the particular facts of that case

a reformation should be granted. The relief was granted in the application of the rule that the mistake of one party, accompanied by fraud or other inequitable conduct of the other party, may be good ground for the reformation of a written instrument, and Pomeroy's statement above copied was cited in support of the holding. The plaintiffs in this case are the children and heirs at law of W. M. Welch, deceased, and are entitled to only such rights as he was entitled to in his lifetime. It is admitted that the father intended to deed to his son the home place of eighty acres and that the deed to so much of the land should stand. While the relief prayed for is not called reformation, the facts bring it within that head of equitable relief.

(3) The next proposition of law to be considered is to determine the amount of proof required to afford relief in cases of this sort. In *Eureka Stone Co.* v. *Roach,* 120 Ark. 326, the court said: "It is the settled rule of this court that to justify or authorize the reformation of a written instrument on the ground of fraud or mistake, the evidence of such fraud or mistake must be clear, unequivocal and decisive."

In *Mitchell Manufacturing Co.* v. *Kempner,* 84 Ark. 349, the court said: "The written contract contained an express stipulation that the machines were 'not guaranteed against slugs, spurious coin or the weather,' and until it is established that this stipulation was inserted in the contract by fraud, accident or mutual mistake, it must be taken as a true expression of the agreement of the parties. The solemn written engagements of contracting parties can not be reformed except upon clear and satisfactory proof that the writing fails, by reason of fraud, accident or mutual mistake, in the preparation or execution thereof, to express the agreement intended to be entered into." *Martin* v. *Hempstead Co. Levee Dist. No.* 1, 98 Ark. 23.

It is objected that these cases can not be used as authorities to sustain the rule of evidence in cases of

mistake of one of the parties coupled with the fraud of the other, for the reason that the first case was a case of mutual mistake and that the cases cited to sustain the principles laid down in the latter case were cases of mutual mistake. This does not lessen their force as authority; for the court was speaking of the recognized grounds for reformation of written instruments and there would be just as much reason for the rule in one case as another.

In *Duecker* v. *Goeres,* 80 N. W. 91, the Supreme Court of Wisconsin said: "Testing the findings under consideration by the familiar rule that to warrant the reformation of a written instrument because of fraud upon the one side and mistake upon the other, or of mutual mistake, the facts in that regard must be made to appear by the most clear and satisfactory evidence, so as to leave no room for reasonable controversy on the subject, they can not be sustained."

In *Pyne* v. *Knight,* 106 N. W. 505, the Supreme Court of Iowa said that to justify reformation of a deed there must have been a mutual mistake or mistake on the part of one party, coupled with fraud on the part of the other; and the evidence showing this mistake must be clear, satisfactory and free from reasonable doubt."

In *Taylor* v. *Deverell,* 23 Pac. 628, the Supreme Court of Kansas recognized this as a familiar rule of evidence, saying: "It is true, as claimed, that to sustain a reformation of a deed, the testimony showing fraud should be clear and satisfactory to the court."

Professor Pomeroy says that parol evidence may be introduced in cases of reformation, especially where the ground of relief is fraud, and recognizes that the parol evidence must be most clear and convincing. Pomeroy's Equity Jurisprudence (3 ed.), vol. 2, par. 859, and vol. 6, par. 682.

In *Boyd* v. *Boyd,* 123 Ark. 134, it was held that evidence of declarations of a grantor, while of sound mind, prior to the execution of the deed, as to his intentions concerning the disposal of his property, was admissible on the question of fraud and undue influence in procuring

the execution of the deed. It is insisted that, by analogy, the same rule applies to the declarations of W. M. Welch and his wife after the execution and delivery of the deed in question to C. W. Welch, to the effect that he intended to divide his property among all his children. We do not think so. Such declarations would have a tendency to defeat the title he had conveyed to his son.

(4) In *King* v. *Slater*, 96 Ark. 589, and other decisions of this court, it has been held that the acts and declarations of a person in possession of a tract of land are admissible to show the character and extent of his possession, but not to contradict his deed to another. In that case we quoted with approval from *Prater* v. *Frazier*, 11 Ark. 249, as follows: "The declarations of a donor against the title of the donee, made in his absence, are not admissible in evidence to defeat the title of the latter." The declarations of W. M. Welch and his wife as to what disposition he intended to make of the lands in controversy were made after the execution and delivery of the deed to C. W. Welch and were made in the absence of the latter. Therefore, they are not admissible as evidence against the defendants in this case. Bearing these rules of law in mind, we now come to a consideration of the facts as disclosed by the record. While W. M. Welch could neither read nor write, and relied on his son, C. W. Welch, in the transaction of his business to a great extent, still the record shows that he was a man of strong mind and exercised a superintending control over his affairs. It is admitted that he intended to convey to his son the home place. He went to the office of Mr. Block with his tax receipt and asked him to prepare a deed to all the lands on it to his son. The deed contained the following: "This conveyance is made subject to the following conditions: That the parties of the first part are to have during the natural life of both of them the use, occupation and rents arising from all of said lands." The use of this language indicated that several tracts were embraced in the deed. Moreover, while it is true, Welch could neither read nor write, he was a man of strong intellect and one

who looked closely after his affairs and would likely have noticed that several tracts of land were contained in the deed. The fact that he could neither read nor write would not prevent him from recognizing descriptions of land when read to him. Opposed to this is the testimony that C. W. Welch recognized his father's right to control the land on several occasions after the execution of the deed. The fact that the land deeded to John Welch was embraced in the deed to C. W. Welch is a circumstance tending to show that the father did not intend to execute the deed to all the land described in the tax receipt. It may be, however, that the father overlooked this tract, and thought that all the lands in the tax receipt still belonged to him. These and other circumstances recited in the statement of facts (and which need not be repeated here), tend strongly to establish the contention of the plaintiffs. We do not deem it necessary to go into an extended discussion of the testimony. When the whole testimony is read and considered together, in the application of the rules of law above announced, we do not think that the plaintiffs have established their case with that clear, unequivocal and decisive evidence which would warrant this court in reversing the decree of the chancellor.

We need say but little here on that branch of the case pertaining to the claim of John Welch. The evidence shows that the father gave him this tract of land in 1874 and John Welch immediately went into possession of it, and has held adverse possession of it ever since. The deed to C. W. Welch was not executed until 1904. At that time John Welch had already obtained title to the land claimed by him by adverse possession.

It follows that the decree must be affirmed.

HUMPHREYS, J., dissents.